UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

<u>NOT FOR PUBLICATION</u>

JAYENDRA SHAH,

                              Plaintiff,

        – against –

MTA NEW YORK CITY TRANSIT, an agency
of the METROPOLITAN TRANSPORTATION
AUTHORITY, STATE OF NEW YORK, JOHN
DOES 1-10, and JANE DOES 1-10,

                              Defendants.

<u>MEMORANDUM & ORDER</u>

12-cv-4276 (ERK) (RLM)

KORMAN, *J*.:

        Jayendra Shah ("Shah"), an Asian man of Indian national origin, filed this action against

the MTA New York City Transit Authority ("NYCTA"), claiming violations of Title VII of the

Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.*), the New York State Human Rights Law

(N.Y. Exec. Law § 296), and the New York City Human Rights Law (N.Y.C. Admin. Code § 8-

107).   Am. Compl. 31, ECF No. 17.   He seeks $3 million in compensatory damages and $3

million in punitive damages, as well as injunctive relief.   *Id.* at 31-32.   The NYCTA has moved

for summary judgment as to all claims.   Mot. Summ. J., ECF No. 52.

## FACTS

### A.  *The Department of Subways*

        The NYCTA's Department of Subways contains the following divisions: Car Equipment,

Rapid Transit Operations, Station Operations, Engineering, Track/Infrastructure, and Electricals.

Def.'s Rule 56.1 Statement ¶ 9, ECF No. 53.   The Division of Car Equipment, where Shah spent

most of his career, is composed of several subdivisions: South Maintenance Shops, North

Maintenance Shops, Overhaul Shops, Emergency Response & Rail Control Center, Car

Equipment Engineering & Technical Support, and Quality Assurance & Warranty Control. *Id.* at ¶ 10. The North Maintenance Shops are responsible for the numbered subway lines, while the South Maintenance Shops handle the alphabetical lines. Efron Decl. Ex. C ("Sowa Dep."), at 19:3–6, ECF No. 55-6.

### B. *Shah's Education and Career*

Shah holds a B.S. in Mechanical Engineering from Gujarat University; a Master's in Transportation Management from the State University of New York, Maritime College; a Certificate in Advanced Chartering Problems from the State University of New York; a Certificate in Budget I and Budget II from John Jay College, City University of New York; and a New York State Certified Professional Engineer License. Pl.'s Aff. Opp'n Def.'s Mot. Summ. J. ("Shah Aff.") ¶¶ 3–5, ECF No. 66.

Shah was hired by the NYCTA in 1982 as a road car inspector. Def.'s Rule 56.1 Statement ¶ 1. During his first 13 years with the NYCTA, he was promoted several times, ultimately becoming General Superintendent ("GS") for the Pitkin and 207th Street Maintenance Shops in 1995. *Id.* at ¶ 7; Pl.'s Rule 56.1 Statement ¶ 9, ECF No. 65. In 1998, after serving for approximately four months as the GS for the Coney Island Maintenance Shop, Shah was reassigned to serve as the GS for the East New York and Concourse Maintenance Shops, a position he retained until 2009. Def.'s Rule 56.1 Statement ¶ 7; Pl.'s Rule 56.1 Statement ¶ 10–11. All of the locations in which Shah worked between 1995 and 2009 were South Maintenance Shops in the Division of Car Equipment. Pl.'s Rule 56.1 Statement ¶¶ 10–11, 15.

In July 2009, as part of the newly established "Line Program," Shah was appointed the Deputy Line General Manager for the "R" line from the Jamaica Maintenance Shop, which is also in the South Division. *Id.* at ¶ 13; Def.'s Rule 56.1 Statement ¶ 18. The Line Program was

dismantled shortly thereafter, and Shah was re-assigned in April 2010 to serve as the GS for the 207th Street Overhaul Shop.  Pl.'s Rule 56.1 Statement ¶¶ 13–14.  Over the next two years, Shah was transferred two more times within the South Maintenance Shops division.  *Id.* at ¶¶ 14–16.

During his tenure at the NYCTA, Shah periodically served for short terms as the Acting Assistant Chief Mechanical Officer ("ACMO"), a position senior to GS, during an existing ACMO's absence.  *Id.* at ¶ 19.  For example, in 2008, although his experience was largely in the division of South Maintenance Shops, Shah served for one month as the Acting ACMO for all North Maintenance Shops.  *Id.* at ¶ 12.  He asserts that he was the only GS in the history of the Division of Car Equipment to be delegated the duties and responsibilities of another subdivision.  Am. Compl. ¶ 24; Efron Decl. Ex. A ("Shah Dep.") 215:25–216:4, ECF No. 55-1–55-4.  Shah also alleged that he was the only GS put in charge of three new technology programs from their inception to completion.  Shah Aff. ¶ 33.

Shah's annual performance reviews are exemplary.  Between 2000 and 2009, he received an "Excellent" overall rating eight times and a "Good" overall rating in the other two years.  Shah Aff. ¶ 96; Doshi Aff. Ex. F, ECF No. 67-1 at 100-13.[1]  His performance reviews repeatedly state that he maintained an "excellent working relationship" with other managers and other departments.  *See* Doshi Aff. Ex. F.  In addition, Shah has received several awards during his career at the NYCTA.  In 1997, Shah was selected as the "manager of the year."  Shah Aff. ¶ 7.  In 1999, he received the NYCTA's President's Circle Award.  *Id.*; Shah Dep. 49:13–20.

### C.  *Shah's Failure to Promote Claims*

Shah applied for 15 promotions within the NYCTA between October 2005 and February 2012, several of which involved multiple vacancies.  *See* Shah Aff. ¶¶ 42–99.  Shah alleges that

---

[1] Neither party included Shah's performance reviews in 2010 or thereafter as an exhibit to their briefing.

the NYCTA unlawfully failed to promote him on 13 of these occasions on the basis of his race, Asian, or national origin, Indian (concepts and terms that he frequently uses interchangeably, *see, e.g.*, Shah Aff. 11; Mem. Opp'n Summ. J. 3, 9–10).[2]  *Id.*  Initially, Shah also asserted claims relating to his applications for the positions of Deputy Vice-President, Engineering Services, in May 2008, and Maintenance General Manager in November 2008.  He subsequently withdrew those claims, *see* Mem. Opp'n Mot. Summ. J. 4 n.1—perhaps recognizing that the selection of Madan Naik, an Indian man, for the latter position undermined his claim, Efron Decl. Ex. V, ECF No. 55-7 at 61.

Had Shah received one or more of the promotions to which he applied, he "would have received a substantial increase in his annual salary and earned additional Hay Points and, as such, would have received a much higher retirement benefits package."[3]  1st Am. Compl. ¶ 29. Because each discrete hiring decision could provide a basis for relief if proven to be motivated by discrimination, I detail each position's requirements, the qualifications of the successful candidates, the NYCTA's stated reasons for selecting other candidates over Shah, and any relevant observations by Shah.  I also provide below a chart with basic information relating to each of the contested positions:

---

[2] The Office of Management and Budget treats "Asian" as one of the "five minimum race categories."  White House Office of Mgmt. & Budget, OMB Bulletin No. 00-02-Guidance on Aggregation and Allocation of Data on Race for Use in Civil Rights Monitoring and Enforcement (2000), https://www.whitehouse.gov/omb/bulletins_b00-02. "Asian," as used in the 2010 Census, "refers to a person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian subcontinent."  Karen R. Humes, Nicholas A. Jones & Roberto R. Ramirez, Overview of Race and Hispanic Origin: 2010, United States Census Bureau, 3 (2011), http://www.census.gov/prod/cen2010/briefs/c2010br-02.pdf.  The Census Bureau explains that: "[t]he race categories included in the census questionnaire generally reflect a social definition of race recognized in this country and are not an attempt to define race biologically, anthropologically, or genetically.  In addition, it is recognized that the categories of the race question include race and national origin or sociocultural groups."  *Id.* at 2.

[3] "Hay Points" is a reference to a ranking system developed by the Hay organization, and utilized by the NYCTA, to rate jobs for purposes of salary determination.  Efron Decl. Ex. B ("Roberts Dep.") 76:10-21, ECF No. 55-5 at 21.

| | Position | Job Vacancy Notice | Date | Hiring Officer(s) | Did Shah Receive an Interview? | Person(s) Selected Over Shah, and Race[4] |
|---|---|---|---|---|---|---|
| 1 | Assistant Chief Mechanical Officer | *Unclear* | Oct. 2005 | Richard Sowa | Yes | George Cortes (Hispanic) |
| 2 | Line General Manager | 4346 | Oct. 2007 | Judith Pierce; Steve Feil | Yes (first round) | Louis Brusati (White) Gricelda Cespedes (Hispanic) Greg Lombardi (White) Joseph Ragusa (White) Herbert Lambert (Black) |
| 3 | Assistant Chief Mechanical Officer | 4484 | Jan. 2008 | Richard Sowa; Marika Herard | Yes | Michael McKernan (White) |
| 4 | Vice-President, Chief Mechanical Officer | 4811 | July 2008 | William Cronin (*and others*) | No | Gennaro Sansone (White) |
| 5 | Group General Manager | 4860 | Aug. 2008 | Howard Roberts; Judith Pierce; Steve Feil | No | David Knights (Black) Louis Brusati (White) Greg Lombardi (White) Gricelda Cespedes (Hispanic) Tracy Bowdwin (Black) |
| 6 | Deputy Line General Manager | 4800 | Aug. 2008 | David Knights; Louis Brusati | No | John Doherty (*Unavailable*) Dwayne Anglero (Hispanic) Frank Jezycki (White) Joseph Leader (White) Paul McPhee (White) Melvin Oliver (Black) Deirdre Taylor (*Unavailable*) |
| 7 | Line General Manager | 5037 | April 2009 | David Knights; Louis Brusati Gricelda Cespedes Greg Lombardi Tracy Bowdwin | Yes | John Doherty (*Unavailable*) Thomas Wehrman (White) Dwayne Anglero (Hispanic) Pamela Elsey (Black) Frank Jezycki (White) Joseph Joyce (*Unavailable*) Evelyn Koehler (Black) Joseph Leader (White) James Leopard (White) Paul McPhee (White) Stephone Montgomery (*Unavailable*) Melvin Oliver (Black) Joseph Ragusa (White) Dierdre Taylor (*Unavailable*) Peter Velasquez (Hispanic) |
| 8 | Vice-President, Chief Mechanical Officer | 5419 | April 2010 | William Cronin (*and others*) | No | George Cortes (Hispanic) |
| 9 | Assistant Chief Mechanical Officer (multiple positions) | 5445, 5453 | June 2010 | George Cortes; Robert Smith; Anne Moran; Dominick Cassaza | Yes | Fayez Saleh (White) John Doherty (*Unavailable*) Mario Guerra (White) Greg Lombardi (White) |
| 10 | Vice-President and Chief Officer, Staten | 5458 | June 2010 | Carmen Bianco; Daryl Irick; | No | Stephone Montgomery (*Unavailable*) |

[4] Race as identified in the NYCTA's Applicant Flow Data Reports. *See* Efron Decl. Exs. O, S, V, Y, DD, NN, ECF No. 55-7 at 41-44, 52-53, 61, 69, 86, 118.

| | | | | Brian Semler | | |
|---|---|---|---|---|---|---|
| 11 | Assistant Chief Mechanical Officer | 5453 | Oct. 2010 | Carmen Bianco; George Cortes | Yes (first round) | Michael Wetherell (White) |
| 12 | Assistant Chief Mechanical Officer | 5779 | July 2011 | George Cortes; Mario Guerra | Yes | Joseph Bromfield (*Unavailable*) |
| 13 | Vice-President, Chief Mechanical Officer | 6025 | Feb. 2012 | Carmen Bianco | Yes | Michael Wetherell (White) |

### 1.  Assistant Chief Mechanical Officer, Overhaul Shops (October 2005)[5]

Shah was interviewed in October 2005 by Richard Sowa, then-CMO for the Division of Car Equipment, for the position of ACMO for Overhaul Shops.  Sowa Decl. ¶ 4, ECF No. 62. Sowa ultimately selected **George Cortes** instead, on the basis of Cortes's "exceedingly" successful performance as GS of the 207th Street Overhaul Shop, a position he held from 2004 to 2006, and, before that, as Superintendent of the Coney Island Overhaul Shop.  *Id.*; *see also* Efron Decl. Ex. EE, ECF No. 55-7 at 89.  Cortes also had a "proven track record in performing major projects," making him "a perfect fit for the position."  Sowa Decl. ¶ 4.  By contrast, Shah "had no experience managing or, to the best of [Sowa's] knowledge, even working in the Overhaul Shops."  *Id.*  Cortes holds a B.S. in Labor Studies, which he received from Empire College in 2004.  Efron Decl. Ex. EE, ECF No. 55-7 at 91.

### 2.  Line General Manager (October 2007)

In 2007, Howard Roberts, then-President of the Transit Authority, implemented a new initiative called the "Line Program."  *See, e.g.*, Knights Decl. ¶ 2, ECF No. 60.  Under this program, all aspects of rail service—Rapid Transit Operations, Car Equipment, Track and Infrastructure, Signals and Stations—would be integrated for each individual subway line and overseen by a single officer.  *See, e.g.*, *id.*

---

[5] Shah's claim that the denial of promotion in October 2005 was discriminatory is time-barred under Title VII, and cognizable under state and city law only if the hiring decision was made on or after October 30, 2005.  *See* Order Mot. Dismiss. 15, ECF No. 16.

In October of 2007, Shah applied for the newly created positions of Line General Manager ("LGM") for the 7 and L lines.  The Job Vacancy Notice called for a baccalaureate degree in Transportation Management or a related field and a minimum of 15 years of relevant experience, including at least eight years of managerial experience, or "a satisfactory equivalent."  Doshi Decl. Ex. G, ECF No. 67-1 at 115.  Under "Desired Knowledge, Skills and Abilities," the Job Vacancy Notice listed: "[s]trong operating experience and skills in the areas of Transportation, Stations Operations, Customer Service, Car Equipment, Infrastructure, Maintenance and Operations Planning."  *Id.*  It also noted that the candidate would "be responsible for staff development and compliance with administrative requirements while fostering a cooperative labor atmosphere."  *Id.*  Judith Pierce, then-Senior Vice-President of Administration, explained that she and her colleagues were looking to find "a balance of . . . people with both operational and other skills" and were especially concerned with hiring "strong leaders who had an established history of working well with the union."  Pierce Decl. ¶¶ 4–5, ECF No. 61.  They were particularly inclined to hire candidates with experience in the Rapid Transit Operations division, "as they were the individuals who knew best how to move trains and passengers along the line in a safe and timely fashion."  *Id.*

Judith Pierce, Steve Feil, and Howard Roberts were responsible for hiring for these positions, with Feil taking the lead.  *See* Roberts Dep. 62:2-63:5, ECF No. 55-5 at 18.  The five candidates ultimately selected for the position are a racially diverse group: Black, White, and Hispanic.  *See* Efron Decl. Ex. O, ECF No. 55-7 at 41.  Their credentials are as follows:

- **Louis Brusati**, who has a B.S. in Architecture, had over 25 years of experience with the NYCTA, including 15 years of managerial experience.  As a Line Superintendent from 1996 to 2004, he managed rail operations for the two longest subway lines in the system (A and 2).  He then spent three years as the General Superintendent for the Westside (1, 2, 3) and Flushing (7) Lines.  In addition, he spent two years (1994-1996) as Director of Special Projects.  Efron Decl. Ex. I, ECF No 55-7 at 15-17.

7

- **Greg Lombardi**, who has a B.S. in Labor Studies, had 27 years of experience with the NYCTA, including 18 years of managerial experience.  He spent five years as the Superintendent for various Maintenance Shops, three years as the GS for the Jamaica Maintenance Shop, and three years as the GS for the Coney Island Overhaul Shop.  Efron Decl. Ex. J, ECF No. 55-7 at 19-24.  Pierce observed that Lombardi was "experienced as an electrician," and that he "was well respected by the union."  Pierce Decl. ¶ 8.

- **Joseph Ragusa**, who lacked a college degree but was pursuing a Certificate in Management at John Jay College, had been with the NYCTA for 25 years, including 20 years in managerial roles.  Between 1989 and 2004, he was the Superintendent of Midnight Operations and then three different Maintenance Shops.  He thereafter served as the GS for Car Equipment Midnight Operations for two years before becoming the GS for the Northern Division West Side Lines in 2006.  He spent four years in the United States Navy and 17 years in the Navy Reserves, where he worked as an electrician.  Efron Decl. Ex. K, ECF No. 55-7 at 26-28.

- **Gricelda Cespedes** holds Bachelor's and Master's degrees in Civil Engineering.  She, too, had spent her entire career at the NYCTA, including 14 years in a managerial capacity.  She served for seven years as the Manager and then Superintendent of Engineering Technical Field Support before becoming the Director of Station Programs and Technical Support in 2000.  From 2002 to 2007, she served as the Assistant Chief Station Officer for Maintenance and Support.  Efron Decl. Ex. L, ECF No. 55-7 at 30-33.  Pierce noted that Cespedes's experience would ensure that passengers could "safely get to their trains through safe, well-functioning stations."  Pierce Decl. ¶ 10.

- **Herbert Lambert**, who lacked a college degree but was pursuing his Bachelor's degree in Transportation Management at City College, had spent 26 years with the NYCTA.  He served in managerial positions in the division of Rapid Transit Operations for 17 years, including as the GS, Control Center; Acting Senior Director; Assistant Chief Transportation Officer, Control Center; and Assistant Chief Transportation Officer, subdivision "A."  Efron Decl. Ex. M, ECF No. 55-7 at 35-37.

Pierce stated that, after interviewing Shah, she felt that "quite simply, other candidates were more qualified for the position."  Pierce Decl. ¶ 11.  She also "recall[ed] that Mr. Shah had a history of antagonism with the union," a perception that was "confirmed to [her] by [the Vice-President] of Labor Relations."  *Id.*  Shah vigorously contests the truth of this statement.  *See* Shah Aff. ¶ 61.

### 3. Assistant Chief Mechanical Officer, Operations (January 2008)

In January 2008, the NYCTA posted a Job Vacancy Notice for an ACMO for the Northern Maintenance Shops.  Efron Decl. Ex. R, ECF No. 55-7 at 50; Sowa Dep. 10:5–14, 22:23–23:5.  The position required 15 years of experience in a relevant industry, including seven in a managerial capacity, or a satisfactory equivalent.  Efron Decl. Ex. R, ECF No. 55-7 at 50.  "Desired skills" included: (a) a Bachelor's degree in Engineering, Business Administration or a "suitable equivalent"; (b) "[k]nowledge of Materials management"; and (c) "[f]amiliarity with other transit, government and private organizations, suppliers and manufacturers.  *Id.*

Shah was one of five applicants identified as Asian in the NYCTA's Applicant Flow Data Report.[6]  Efron Decl. Ex. S, ECF No. 55-7 at 52–53.  Shah was the only Asian interviewed; the other four were designated "not qualified" or, simply, "not interviewed."  *Id.*  Sowa, who was in charge of hiring for this position, ultimately selected a Caucasian man, **Michael McKernan,** for the position.  McKernan, who has a Bachelor's degree in Labor Studies, had run every Maintenance Shop in the North Division before becoming the GS of the 207th Street Overhaul Shop.  Efron Decl. Ex. T, ECF No. 55-7 at 55.  According to Sowa, McKernan was "a very likable individual that got along with the various unions very well and everybody.  He was very capable of handling big projects," as he had done as GS.  Sowa Dep. 19:16–23.  Sowa explained that McKernan was more qualified than Shah because of his extensive experience in the North Division, where the ACMO would be based.  *Id.* at 17:5–21, 19:24–21:6 ("McKernan would walk right into the position without any familiarization or training . . . .  He knew each shop and he worked in each shop in the northern direction.  He was no stranger.").  Sowa explained that Northern and Southern division operations are "similar," but "the difference is the locations, the

---

[6] The NYCTA Applicant Flow Data Reports submitted by the parties include only the following racial categories, without further specificity: White, Black, Hispanic, and Asian.

yard layouts." *Id.* at 20:4–12.  The South Division "has more subway cars, but the . . . northern division basically is split up between two different sides, the east side lines and the west side lines." *Id.* at 24:2–11.

Sowa also stated that he believed McKernan's management style made him more qualified than Shah, because McKernan "got along with various vendors, people, he was good with the union with various situations," while Shah "sometimes at times had a—a little friction with—with the hourly union, and what have you." *Id.* at 24:12–25:25.  Shah also "didn't handle as many projects as Mike McKernan did, big ones.  And didn't move around to various locations . . . . Shah stayed basically in one or two places for many years." *Id.* at 25:25–26:6.

### 4.  Vice-President, Chief Mechanical Officer (July 2008)

The CMO position advertised in July 2008 required "[s]eventeen years of experience in rapid transit or related industry with at least ten years of experience in a supervisory or managerial capacity; or, a satisfactory equivalent." Efron Decl. Ex. X, ECF No. 55-7 at 67.  "Desired skills" included a baccalaureate degree in Engineering, Business Administration or a suitable equivalent. *Id.* Of the 21 applicants, three, including Shah, were Asian.  Efron Decl. Ex. Y, ECF No. 55-7 at 69.  None of the three were interviewed. *Id.*

**Gene Sansone** was selected for the position.  Sansone has a B.S. in Electrical Engineering and had spent more than 30 years with the NYCTA.  Efron Decl. Ex. Z, ECF No. 55-7 at 71–72.  According to William Cronin, who served on the hiring panel, Sansone "was highly regarded as a leader in the transportation industry.  He had authored and presented various technical papers to professional organizations, and received an appointment as an adjunct professor at Polytechnic University assigned to teach material directly related to the functions performed by a CMO." Cronin Decl. ¶ 3, ECF No. 59.  Moreover, he "was already serving with

great success" as the ACMO for Car Equipment Engineering & Technical Support.  *Id.*; Efron

Decl. Ex. Z, ECF No. 55-7 at 71.  Cronin explained that "Shah's experience was less broad as he

had never successfully performed above the title of [GS] . . . . and focused on a much narrower

portion of the car equipment division."  Cronin Decl. ¶ 7.

### 5.  Group General Manager (August 2008)

In August 2008, NYCTA posted a Job Vacancy Notice for Group General Managers

("GGM"), who would be responsible for supervising the LGMs for the subway lines included in

each group.  Knights Decl. ¶ 3, ECF No. 60.  The posting called for a baccalaureate degree in

Transportation Management or a related field and at least 15 years of related experience,

including at least eight years in a managerial position, or a satisfactory equivalent.  Efron Decl.

Ex. N, ECF No. 55-7 at 39.  "Desired skills" include "senior level managerial experience in mass

transportation services" and "strong operating experience and skills in the areas of

Transportation, Stations Operations, Customer Service, Car Equipment, Maintenance of Way

(Track, Structures, Signals, Facilities, Signal Operations, Third Rail), Maintenance and

Operations Planning."  *Id.*  Of the 110 applicants for the position, six, including Shah, were

Asian.  Efron Decl. Ex. O, ECF No. 55-7 at 41–44.  None of the six were interviewed.  *Id.*

**David Knights** and **Louis Brusati** were selected for the initial rollout of the Line

Program on the IRT; **Greg Lombardi**, **Gricelda Cespedes**, and **Tracey Bowdwin** were chosen

as additional GGMs for the full rollout of the program.  Pierce Decl. ¶¶ 12-13.  Brusati,

Lombardi, and Cespedes had been successfully serving as LGMs since the previous year.  *Id.* at

¶¶ 8, 13.  Knights had 20 years of managerial experience, both as a NYCTA employee and as a

project manager for private transportation consulting companies, and was then serving as the

Chief Officer of Track and Signals.  *Id.* at ¶ 12.  According to Pierce, "[she, Roberts, and Steve

Feil] felt that [Knight's] extensive knowledge of Track and Signals and its employees, in combination with his experience with capital projects management for several transit systems, would make him a valuable part of the Line Program management team." *Id.* Finally, Bowdwin, "an extremely capable former Assistant Chief Signals Officer," had also previously been a Maintenance General Manager responsible for "Maintenance of Way" work. *Id.* According to Pierce, "[a]ll three of these people had a history of having great relationships with the union and with other managers, as well as being outstanding in their areas of expertise." *Id.*

Pierce explained that, "[j]ust as Mr. Shah's antagonistic relationship with the union made him a poor candidate to be a LGM, it also made him a poor candidate for GGM. We did not even interview him for this position because we knew he would not be an appropriate selection for GGM." *Id.* at ¶ 14. Roberts also noted that, "if you didn't get on the original [LGM] escalator, then you couldn't become essentially a [GGM]." *See* Roberts Dep. 66:7–21.

### 6. Deputy Line General Manager (August 2008)

NYCTA created a new position of Deputy Line General Manager ("DLGM") in August 2008, a "high-level managerial position that, using the Hay operational evaluation system, was rated equivalent to most GS positions, including those in the Division of Car Equipment." Knights Decl. ¶ 5. Knights and Brusati, who, as GGMs, would oversee the LGMs and DLGMs for each subway line in their "group," were responsible for hiring. Knights explained: "[o]ur goal, in choosing LGMs and DLGMs for the initial rollout, was to create a balanced management team by selecting experienced individuals with expertise in the different Divisions of the Department of Subways." *Id.*; *accord* Brusati Decl. ¶ 6, ECF No. 57. The Job Vacancy Notice called for a baccalaureate degree in Transportation Management or a related field and a minimum of ten years of related experience, including at least four in management, or a

12

satisfactory equivalent.   Efron Decl. Ex. P, ECF No. 55-7 at 46.   "Desired skills" included "[s]trong operating experience and skills in the areas of Transportation, Station Operations, Customer Service, Car Equipment, Infrastructure, Maintenance and Operations Planning."   *Id.*

Knights stated in his declaration—possibly referring to the candidates for both the DLGM and LGM positions for which they were then interviewing—that "[m]ost of [the] qualified applicants had over 20 years of experience with the [NYCTA], other Metropolitan Transportation Authority agencies (such as the Long Island Rail Road) and both public and private transportation companies and consulting firms."   Knights Decl. ¶ 7.   Of the seven individuals hired as DLGMs, only one—**John Doherty**—came from the Division of Car Equipment.   *Id.* at ¶ 9.   Shah focuses his attention on Doherty's qualification.   Shah Aff. ¶¶ 62–65.   I will therefore do the same.

Doherty does not include an "Education" section on his resume, and so presumably does not have a college degree.   *See* Doshi Decl. Ex. W, ECF No. 67-2 at 65–66.   He began working for the NYCTA in 1979 as a Conductor and Tower Operator, working his way up to Acting Superintendent for Work Trains by 1990.   *Id.*   From 1992 to 2006, he was the Superintendent for Road Operations in the Division of Car Equipment.   *Id.*   He then served as the GS for Emergency Response for two years.   *Id.*   Knights and Brusati explain that they selected Doherty on the basis of his "decades of experience with work cars . . . as well as with Car Equipment's Emergency Response Unit."   Knights Decl. ¶ 10; Brusati Decl. ¶ 7.   In addition, "[b]ecause he had worked in [RTO and on capital projects] previously, Doherty had hands-on experience not only with providing subway service but also with Track, construction and all of the other elements of a capital improvement project."   Brusati Decl. ¶ 7.   By contrast, Shah had no experience with either work cars or emergency response.   *Id.*

13

### 7.  Line General Manager (April 2009)

In April 2009, the same leadership team hired additional LGMs and DLGMs to complete the rollout of the Line Program.  *See id.* at ¶ 9.  Shah reapplied and received an interview.  Shah Aff. ¶ 73.  Of the 14 individuals hired as LGMs, two were promoted from the Division of Car Equipment: **John Doherty**, then serving as a DLGM, and **Thomas Wehrman**.  Brusati Decl. ¶¶ 11–12.  Wehrman had an Associate's Degree in Technical Electronics and 19 years of managerial experience.  Efron Decl. Ex. AA, ECF No. 55-7 at 74-75.  He served from 1989 to 1990 as the Deputy Superintendent of the 207th Street Overhaul Shop, and, similarly to Shah, spent the next 18 years in management positions within the division of South Maintenance Shops, culminating in his appointment in 2006 as GS of the Coney Island Maintenance Shop.  *Id.* Brusati explains that:

> [a]lthough Wehrman was a [GS] in Car Equipment just as Mr. Shah was, Wehrman had been working at the Coney Island Maintenance Shop, a large and complex shop that served the entire Southern Division of the subway system.  The East New York/Concourse Maintenance shop, where Mr. Shah was [GS], was significantly smaller.  Wehrman also had experience working as an acting ACMO and working in overhaul shops; Mr. Shah did not have any experience in either of these areas.

Brusati Decl. ¶ 12.  Shah notes that, in fact, he and Wehrman worked together at both the Coney Island Maintenance Shop and the 207th Street Maintenance Shop, and that, in both cases, Wehrman was subordinate to him.  Shah Aff. ¶¶ 74–75.  He also observes that Wehrman was made the LGM for the J, Z, and M lines, which are served by the East New York Maintenance Shop in which Shah had served as GS for approximately ten years.  *Id.* at ¶ 76.

While rejecting him for the LGM position, the hiring committee selected Shah as one of 17 new DLGMs, and assigned him to the "R" Line.  *See* Brusati Decl. ¶ 13; Shah Aff. ¶ 76.  Shah asserts that this "was **NOT** a promotion" because "while [he] was given an increase in

compensation, it resulted in a decrease in Hay Points.  Essentially the posted position was a [GS] position that [he] had been performing since 1995."  Shah Aff. ¶ 66.

### 8.  Vice-President, Chief Mechanical Officer (April 2010)

The Line Program was discontinued in 2010, and the roles of GGM, LGM, and DLGM were replaced with the Chief Mechanical Officer ("CMO") and Assistant Chief Mechanical Officer ("ACMO") positions that had been in place prior to 2007.  *See* Cortes Decl. ¶¶ 5–6.  In April 2010, Gene Sansone, then serving as CMO, retired from the NYCTA.  Cronin Decl. ¶ 4. Approximately 30 people applied to fill the resulting vacancy.  *Id.*  Five of the applicants, including Shah, were Asian.  ECF No. 55-7 at 86.  None of the five received an interview.  *Id.*

**George Cortes** was selected for the position.  He had spent four years as ACMO for Overhaul Shops and had been serving as the Acting CMO since Sansone's departure.  Efron Decl. Ex. EE, ECF No. 55-7 at 88.  Because Cortes anticipated that he would also be retiring shortly, **Mario Guerra** was selected to serve as ACMO in the interim and then be elevated to CMO upon Cortes's eventual departure.  Cronin Decl. ¶ 5.

Guerra was then the General Superintendent for Rail Cars and Shops at the Toronto Transit Commission, "one of the few transportation properties in North America that rivaled the Transit Authority in size and complexity," where he had worked for three decades.  *Id.* at ¶ 6; Efron Decl. Ex. JJ, ECF No. 105-107.  According to Cronin, who served on the hiring committee, Guerra's "qualifications included significant strategic planning skills, experience in overseeing revenue vehicle procurements and very strong communication skills."  Cronin Decl. ¶ 6.  Guerra "had also been a member of the team that had negotiated the Commission's most recent collective bargaining unit."  Cortes Decl. ¶ 16.

**9.   Assistant Chief Mechanical Officer (*multiple positions*) (June 2010)**

After the dismantling of the Line Program, there were three ACMO positions to fill: (1) ACMO, for North Maintenance Shops; (2) ACMO for Emergency Response and Control; and (3) ACMO for Overhaul Shops.   Cortes Decl. ¶ 11.   George Cortes, along with two ACMOs and a Human Resources representative, was responsible for hiring.   *Id.*

For the position of ACMO, Operations, North Division Maintenance, the team selected **Fayez Saleh**.   *Id.* at ¶ 12.   Sayeh, who holds a B.S. in Engineering, Master of Science in Transportation Management, and Master's in Civil Engineering, had been working in the Division of Car Equipment since 1984.   Doshi Decl. Ex. II, ECF No. 67-3 at 20.   Between 1993 and 2003, he served as the Superintendent for five different Maintenance Shops.   *Id.*   He then spent seven years as a GS for various Overhaul and Work Equipment Shops, and then as the head of "PM Operations"—i.e., nighttime operations.   *Id.*   He had been serving as the Acting ACMO for North Maintenance Shops since April 2010.   *Id.*   Cortes observed that Salez "was extremely intelligent and motivated . . . . He knew the cars incredibly well and always . . . did whatever he could to help the division run more smoothly."   Cortes Decl. ¶ 12.   For example, Saleh volunteered to take over the undesirable PM Operations job.   *Id.*   Cortes felt that, based on his personal experience working with Saleh, he "could trust him to run the Northern shops well and with little input from [Cortes]."   *Id.* at ¶ 13.

**John Doherty** was selected for the position of ACMO, Operations, Emergency Response and Control Center.   *Id.* at ¶ 14.   In light of his experience as GS for the Emergency Response Unit, DLGM, and then LGM, Cortes viewed him as "the obvious choice" for this opening.   *Id.* at ¶ 15.   Moreover, Doherty's "experience with [Rapid Transit Operations] made him an even better candidate for the inter-division coordination required of the person in charge of

16

Emergency Response." *Id.*  Cortes was also impressed by Doherty's "extensive experience with work trains." *Id.*  By contrast, Shah "had none of the work car, Control Center, Emergency Response or [Rapid Transit Operations] experience that Doherty had." *Id.*  Cortes observed: "[t]he ACMO for this unit needs to live Emergency Response—to not only know the available equipment and what needs to be done, but also whom to call to address all aspects of the emergency situation including moving the equipment.  John Doherty was that person." *Id.*

**Mario Guerra** was selected to serve as the ACMO for Overhaul Shops "with the understanding that, if his performance was satisfactory, he would become CMO when [Cortes] retired in approximately 18 months." *Id.* at ¶ 17.  Cortes also selected **Greg Lombardi** to take over this position when Guerra was elevated to CMO.  Before entering the Line Program, Lombardi had been the GS of the Coney Island Overhaul Shop.  *Id.* at ¶ 18.  He had subsequently served as a GGM in the Line Program, where he was "responsible for the safe and efficient running of all IND and some BMT subway lines." *Id.*  Cortes stated that he felt that Shah did not have sufficient Overhaul experience to qualify him for the position.  *Id.*

### 10. Vice-President and Chief Officer, Staten Island Railway (June 2010)

In June 2010, Carmen Bianco, then-Senior Vice-President of the Transit Authority's Department of Subways, interviewed candidates for the position of Vice-President and Chief Officer, Staten Island Railway.  Bianco Decl. ¶ 2, ECF No. 56.  The Staten Island Railway, a subsidiary of the NYCTA, operates a rapid transit line in Richmond County.  *Id*.  "Its Vice President and Chief Officer . . . is accountable for executive level management of all rail operations; strategic planning to improve system performance through the adoption of new technology; inspection, maintenance and repair of railroad equipment; development and

implementation of policies and procedures; and direction of all administrative, human resources and labor relations activities." *Id.* Shah submitted an application but was not interviewed. *Id.*

**Stephone Montgomery** was selected. *Id.* at ¶ 3. Before joining the NYCTA in 2008 as a DLGM, Montgomery was a Superintendent with the Long Island Rail Road for eight years. Efron Decl. Ex. LL, ECF No. 55-7 at 111–14. In that capacity, he oversaw first the Operating Rules and Air Brake Procedures, and then Jamaica Operations. *Id.* Montgomery does not have a college degree, although he received "over 60 credits towards a Bachelor Degree in Business Administration" at Adelphi University/Empire State College. *Id.*

### 11. Assistant Chief Mechanical Officer (October 2010)

In October 2010, NYCTA sought to hire an ACMO for Car Equipment Engineering and Technology. Efron Decl. Ex. MM., ECF No. 55-7 at 116. Although the Job Vacancy Notice stated that the position required "a baccalaureate degree from an accredited college in Business Administrati[on], Engineering *or a satisfactory equivalent*," *id.* (emphasis added), Cortes explained that a degree in engineering was required for this position, Cortes Decl. ¶ 21.

All but one of the nine candidates for the position, including Shah, were interviewed. Efron Decl. Ex. NN, ECF No. 55-7 at 118. Cortes explained that his decision ultimately came down to two candidates: Keith Falk, an electrical engineer then serving as the Acting ACMO for Engineering and Technology; and **Michael Wetherell**, a mechanical engineer with an engineering degree from the U.S. Naval Academy in Annapolis and a Master of Science degree in civil engineering from New York University – Polytechnic in Brooklyn. Cortes Decl. ¶¶ 19–20; Efron Decl. Ex. OO, ECF No. 55-7 at 120–23. After being interviewed by Mr. Bianco and his staff, Wetherell was selected for the position. Cortes Decl. ¶ 21.

Wetherell had been the Vice-President of Urban Engineers of New York, a private consulting company, since 2004.  Efron Decl. Ex. OO, ECF No. 55-7 at 122–23.  In that capacity, he worked in project management for the Metropolitan Transportation Authority and as a technical advisory and procurement officer for other agencies.  *Id.*  He previously served as an ACMO, and then the General Manager for Fleet Engineering, for the Long Island Rail Road.  *Id.*  Cortes was also impressed by his experience as a Navy Engineering Officer.  Cortes Decl. ¶ 20.

### 12. Assistant Chief Mechanical Officer (July 2011)

In July 2011, the NYCTA posted a job vacancy notice for an ACMO for South Maintenance Shops.  *Id.* at ¶ 22.  Cortes, then-Deputy CMO Guerra, and a Human Resources representative interviewed several candidates for the position, including Shah.  *Id.* at ¶ 23.  **Joseph Bromfield** was ultimately selected for the position.

Bromfield joined the NYCTA in 1980 as a car cleaner and worked his way up to become a GS.  Efron Decl. Ex. QQ, ECF No. 55-7 at 127–28.  Between 1994 and 2009, he worked at three different Maintenance Shops as, respectively, the Deputy Superintendent, Superintendent, and GS, before being appointed the DLGM for the "C" line.  *Id.*  After the dissolution of the Line Program, Bromfield briefly held the position of GS for the Jamaica Maintenance Shop before being appointed the GS for the West Side Lines, a position he had held for under a year before being promoted to ACMO for South Maintenance Shops.  *Id.*

Cortes explained that Shah was not chosen largely because of

> the fact that Shah had repeatedly had difficulty managing his employees (both hourly employees and managers) during his years as a GS . . . . [A]t one point Mr. Shah's problems with the Superintendent at the Pitkin shop nearly turned into a fistfight. Prior to that, Mr. Shah had difficulty with his hourly employees during his time in East New York, failing to repair leaks and properly maintain fans that were essential to the safe operation of the shop.  It also came to my attention that, while in East New

19

> York, Mr. Shah had problems with some of his female employees.
> Mr. Shah even had difficulties with managers from other
> departments the [sic] Transit Authority.  For example in 2001,
> while he was at the East New York shop, Mr. Shah had an incident
> with a GS from the Department of Buses.  The incident was
> reported to the CMO of Buses and resulted in a letter being sent to
> Car Equipment's upper management.

Cortes Decl. ¶ 24.  Cortes felt that "Mr. Shah's years in Car Equipment had shown him to be

more of a problem creator than a problem solver," making him ill-suited for a promotion to a

higher-level management position.  *Id.* at ¶ 25.  Shah's performance reviews—which were not

completed by Cortes—contradict these criticisms, however, and Shah disputes their truth.  *See*

Doshi Aff. Ex. F, ECF No. 67-1 at 100–113; Shah Aff. ¶¶ 36–37.

### 13. Vice-President, Chief Mechanical Officer (February 2012)

In February 2012, the NYCTA posted a Job Vacancy Notice for Vice-President and

CMO for the Division of Car Equipment, which called for: "[t]horough knowledge of subway

car maintenance and overhaul requirements and practices [and b]road knowledge of rapid transit

operations."  Efron Decl. Ex. RR, ECF No. 55-7 at 130.  The CMO would be "accountable for

efficiently directing and controlling all activities related to the management of rolling stock in

order to ensure the availability of safe, reliable and clean equipment for operational

requirements.  Additionally, [the CMO] provides executive direction and oversight to all car

engineering, design and procurement efforts."  *Id.*

Five candidates, including Shah, were initially interviewed by Sally Librera, Dawn

Pinnock and Craig Stewart.  Bianco Decl. ¶ 4.  Shah and **Michael Wetherell** made it to the

second round, where they were interviewed by Bianco and Pinnock.  *Id.*  Bianco ultimately chose

Wetherell, who was then serving as the ACMO for Car Equipment Engineering & Technical

Support.  *Id.*  She was impressed by his "combination of technical experience and demonstrated

leadership qualities and accomplishments, which were underscored during his interview in which he addressed complex issues of safety and organizational challenges . . . ." *Id.*

### D. Shah's Numerical Evidence

In support of his discrimination claims, Shah points to what he perceives to be the dearth of people of Indian ethnicity or national origin in the Division of Car Equipment. *See* Mem. Opp'n Mot. Summ. J. 9. Specifically, he observes that, between 2004 and 2012, he was the only Indian to hold a position of GS or higher within the division. *Id.* at 8–9. He states that:

> [f]or the Officer, Ex. Mgr Operations/DCE Engineering/ACMO positions, which were one level above [GS], there were a total of between 3 and 7 positions per year. None of the individuals holding these positions were Asian or Indian. For the [GS]/Senior Manager positions during this time period, there were a total of 3 to 13 positions per year. Until 2012 only one was held by an Asian. (Mr. Shah).

*Id.* at 9–10. Shah does not clarify whether there were three to 13 *openings* per year, or three to 13 positions at those levels in any given year.

He also alleges that of the 18 DLGM positions existing in 2009, only two were held by Asians (including Shah), and of the 16 DLGM positions existing in 2010, only two were held by Asians (including Shah). *Id.* at 10. Shah did not provide any materials corroborating these allegations. While Marika Herard, a Human Resources representative involved in the January 2008 ACMO hiring, testified at her deposition that there were no "high level managerial employees of Indian descent" in the "electrical, stations, power, tracks, and structures" divisions during her time at the NYCTA, Doshi Decl. Ex. B, ECF No. 67-1 at 67, Shah did not submit any evidence as to the length of Herard's employment with the NYCTA, or the basis for her knowledge.

### E. Shah's EEO Filings

In May 2008, Shah filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), claiming employment discrimination on the basis of his race and national origin.  Doshi Decl. Ex. A, ECF No. 67-1 at 36–44.  On May 24, 2011, following an investigation, the EEOC issued a Determination concluding that the NYCTA had discriminated against Shah in violation of Title VII of the Civil Rights Act of 1964.  Doshi Decl. Ex. B, ECF No. 67-1 at 46–47.  Specifically, the EEOC found that the NYCTA:

> selected and promoted at least 3 individuals with fewer objective qualifications than [Shah] for the position of [LGM] [in October 2007].  These individuals had fewer years of experience than [Shah] in managerial/supervisory positions.  Two of the people selected did not even have a college degree.  Further, with regard to the ACMO position, a comparison of the credentials of [Shah] with those of the person selected reveals that [Shah] possesses relevant experience . . . . Regarding both jobs, the record shows that [Shah] met or exceeded the objective requirements and that no documentation has been submitted as to the subjective ones, namely management style and approach.  Based on the above, Respondent's asserted defense does not withstand scrutiny . . . . .

*Id.*  In addition, on or about July 12, 2012, Shah filed a complaint with the NYCTA's internal Equal Employment Opportunity Division regarding the denial of his applications for promotion for the ACMO position posted in July 2011 and the CMO position posted in February 2012.  Am. Compl. ¶ 31.  This appeal was still pending when Shah filed his Amended Complaint.  *Id.*

### F. Shah's Retaliation Claims

Shah claims that he was retaliated against for filing a complaint with the EEOC.  *Id.* at ¶¶ 32–54.  He alleges that he suffered numerous adverse employment actions, to wit: he was (1) "asked" to attend LGM training classes and given the title of DLGM, which he portrays in the context of his retaliation claim as a demotion from GS, *id.* at ¶ 33; Shah Dep. 191:11–20 (2) assigned as DLGM for the "R" line, "which was one of the worst-performing subway lines,"

Am. Compl. ¶ 34; (3) not initially given an assigned work space at the Jamaica Maintenance Shop and compelled to "primarily work[] from different train dispatchers' offices located on the subway platform" for approximately three months before an office was provided to him, *id.* at ¶ 35; Shah Dep. 192:12–16, 325:2–16, 331:6–11; (4) reassigned in April 2010 to the 207th Street Overhaul Shop, "which was more than double the distance from his then current assignment and much further away from [Shah's] place of residence," where he was "further demote[d]" to the position of "Acting" GS, Am. Compl. ¶¶ 36–37; Shah Dep. 381:2–15; (5) asked to apply for the GS position, despite having held that position for nearly 15 years; moreover, although Shah did apply, as of the filing of his Amended Complaint, he had not yet received an "official memo" confirming his title as GS, and his NYCTA-issued employee identification card still listed the defunct title of DLGM, Am. Compl. ¶¶ 38–40; Shah Dep. 382:4–10, 383:8–12; (6) transferred in January 2011 to the Pitkin and 207th Street Maintenance Shop, one of the "worst" performing Maintenance Shops, Am. Compl. ¶ 41; Shah Dep. 270:13–25, 272:2–4; and (7) transferred again in June 2012 back to the Jamaica Maintenance Shop "without any explanation," Am. Compl. ¶ 42; Shah Dep. 136:11–137:2.

Shah alleges that he is "the only GS" in the Division of Car Equipment to have been transferred four times since 2009. Am Compl. ¶ 44. Moreover, he asserts that of the four individuals who held the position of GS as of June 2009, Shah was the only one transferred multiple times. *Id.* at ¶ 43. "[T]he other three original [GSs] were moved only once from their original work locations and then back to their original work location. Further, two of those other three [GSs] were given back their official [GS] titles (not just Acting), without any interview."[7] *Id.*; *see also* Shah Dep. 384:3–385:7.

---

[7] Shah's emphasis on the fact that his peers were given their "official [GS] titles (not just Acting), without any interview" is in conflict with his acknowledgement that "no interview was conducted" after he applied for the GS

In addition, Shah claims that he has faced retaliation in "simply attempting to comply with Defendant's internal policies and regulations." *Id.* at ¶ 52. He alleges that Bianco, as Senior Vice-President of the Department of Subways, failed to respond to Shah's request for approval regarding post-retirement employment with NYCTA vendors or suppliers with whom Shah interacted during his employment, as required by NYCTA policy. *Id.*; Shah Dep. 385:17–390:6. He received approval "well over a month later," only after contacting NYCTA's in-house counsel. Am Compl. ¶ 52; Shah Dep. 385:17–390:6. In addition, while he had asked that Bianco and Wetherell keep this request confidential, "either one or both of them disclosed this information to [Shah's] current ACMO, Joseph Bromfield." Am. Compl. ¶ 53. As a result, "Bromfield started questioning [Shah] about his post-retirement job searches, informed [Shah] that he was not happy with him and started neglecting [Shah] for weeks in connection with the performance of his duties." *Id.*

### G. Procedural History

On May 29, 2012, the U.S. Department of Justice notified Shah that it would not file suit on his EEOC charge and that he had a right to bring suit in federal court within 90 days. Doshi Decl. Ex. B, ECF No. 67-1 at 49. Shah timely commenced the instant action on August 24, 2012. Compl., ECF No. 1. On February 8, 2013, I granted in part NYCTA's motion to dismiss, striking: (1) all claims pursuant to 42 U.S.C. §§ 1981 and 1983; (2) the amorphous "failure to promote" claim that was duplicative of Shah's Title VII claims; (3) all Title VII claims pre-dating July 13, 2007; and (4) all claims pursuant to state and city law pre-dating October 30, 2005. Order Mot. Dismiss 15. Shah timely amended his complaint in accordance with that decision. The NYCTA's motion for summary judgment followed.

---

position in 2010. Am. Compl. ¶ 39. Nevertheless, interpreted liberally, Shah seems to be alleging that he was compelled to reapply for the official GS title while his counterparts were not, and that their official titles had been restored while, at the time of his Amended Complaint, his had not. *See id.* at ¶¶ 38–39, 43.

**DISCUSSION**

*A.  Standard of Review*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  On a motion for summary judgment, the court must resolve all ambiguities, and draw all inferences, against the moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  Nevertheless, if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249–50.

*B.  Shah's Claim Relating to the October 2005 Denial of Promotion*

Shah's claim that he was discriminated against in October 2005, which I already held to be time-barred under Title VII, is also time-barred under state and city law because the hiring decision was made before October 30, 2005. *See* Order Mot. Dismiss. 15.  The NYCTA produced a Personnel Action Request created on October 25, 2005, which indicates that George Cortes had already been selected for the position.  ECF No. 70.  In light of this evidence, there is no genuine dispute as to when the allegedly discriminatory act occurred.

*C.  Shah's Discrimination Claims Under Title VII and the State Human Rights Law*

**1.  Legal Standards**

The legal standards for discrimination claims under Title VII and the New York State Human Rights Law ("SHRL") are "analytically identical." *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 n.9 (2d Cir. 2008), *as amended* (Apr. 22, 2008) (citations omitted); *accord Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2010); *Patane v. Clark*, 508 F.3d

25

106, 113 (2d Cir. 2007); *Whyte v. Nassau Health Care Corp.*, 969 F. Supp. 2d 248, 254–55

(E.D.N.Y. 2013) ("[T]he New York Executive Law inquiry is subsumed within the Title VII

analysis."). As such, I analyze Shah's federal and state law discrimination claims in tandem.

A plaintiff alleging a violation of Title VII "must establish, by a preponderance of the

evidence, a prima facie case consisting of four elements: (1) that plaintiff falls within the

protected group, (2) that plaintiff applied for a position for which he was qualified, (3) that

plaintiff was subject to an adverse employment decision and (4) that the adverse employment

decision was made under circumstances giving rise to an inference of unlawful discrimination."

*Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001) (citing *McDonnell*

*Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973)) (other citations omitted). "The burden upon

the plaintiff to prove a prima facie case is minimal." *Id.* (citations omitted). Once a prima facie

case has been established, "the burden of production shifts to the employer who must defeat a

rebuttable presumption of discrimination by articulating a legitimate, non-discriminatory reason

for the employment decision." *Id.* at 102 (citation omitted). "If the employer offers, via

admissible evidence, a justification of its action which, if believed by a reasonable trier of fact,

would allow a finding of no unlawful discrimination, then . . . the sole remaining issue [is]

discrimination *vel non*." *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,

120 S. Ct. 2097, 2106 (2000)) (internal quotation marks omitted). The plaintiff bears the

"ultimate burden of persuading the trier of fact that the defendant intentionally discriminated

against" him. *Id.* (quoting *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000)).

On a motion for summary judgment, a district judge must "examine the record as a

whole, just as a jury would, to determine whether a jury could reasonably find an invidious

discriminatory purpose on the part of the employer." *Id.* (citations omitted). The Second Circuit

has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent," since "direct evidence of [discriminatory] intent will only rarely be available." *Holcomb v. Iona College*, 521 F.3d 130 (2d Cir. 2008) (citations omitted).

Instead, the district judge must "carefully scrutinize[]" affidavits and depositions for "circumstantial proof which, if believed, would show discrimination." *Id.* (citing *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1224 (2d Cir. 1994)). "Proof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Byrnie*, 243 F.3d at 102 (quoting *Reeves*, 120 S. Ct. at 2108). The Second Circuit has also recognized that "an employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of [its] stated justification for an employment decision." *Id.* at 103 (citation omitted).

While evidence that the plaintiff's qualifications were superior to those of the successful applicant "may suffice, at least in some circumstances, to show pretext," *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456–58 (2006) (citations omitted), "the court must respect the employer's unfettered discretion to choose among qualified candidates," *Byrnie*, 243 F.3d at 103. Its role is "not to act as a 'super personnel department' that second guesses employers' business judgments." *Id.* (citation omitted). The Second Circuit has made clear that "[t]he employer need not prove that the person promoted had superior objective qualifications, or that it made the wisest choice, but only that the reasons for the decision were nondiscriminatory." *Davis v. State Univ. of N.Y.*, 802 F.2d 638, 641 (2d Cir. 1986) (citations omitted).

## 2.  Analysis

Plaintiff is Asian by race and Indian by national origin, Shah Aff. ¶ 40, and is therefore a member of a protected class, *Sethi v. Narod*, 12 F. Supp. 3d 505, 522–23 (E.D.N.Y. 2014) (citing cases).  It is undisputed that Shah was qualified for every position for which he was interviewed, *see* Mem. Supp. Mot. Summ. J. 9 ("Shah was qualified for the position—he would not have been interviewed otherwise . . . ."), and he was interviewed for all but five of the contested positions: CMO (July 2008); GGM (August 2008); DLGM (August 2008); CMO (April 2010); and Vice-President and Chief Officer, Staten Island Railway (June 2010).[8]  Shah has established by a preponderance of the evidence that he was also qualified for these five positions, as he met the official "Experience and Education Requirements" for each position.  *See* Efron Decl. Exs. N, P, X, CC, KK, ECF No. 55-7 at 39, 46, 67, 84, 109.  Shah was denied each of these promotions, which satisfies the requirement for an "adverse employment action," *Terry v. Ashcroft*, 336 F.3d 128, 139 (2d Cir. 2003) (citation omitted), and in each case, one or several non-Asian candidates were selected in his stead, *see* Shah Aff. ¶ 40; Efron Decl. Exs. O, S, Y, DD, NN, ECN No. 55-7 at 41, 52, 69, 86, 118.  Finally, "[d]rawing all permissible factual inferences in plaintiff's favor," as I must, and recognizing that the plaintiff's burden in establishing a prima facie case is "minimal," *Holcomb*, 521 F.3d at 139, I find that Shah's evidence that he was repeatedly rejected, often multiple times by the same decision-makers, in favor of non-Asian candidates with lesser educational credentials and/or fewer years of experience, is sufficient to raise an inference of unlawful discrimination.  Shah has therefore established a prima facie case of unlawful discrimination under Title VII and the SHRL as to each of the 12 discrimination claims post-dating July 13, 2007.  The NYCTA has, in turn, met its burden of production by articulating

---

[8] Moreover, defendant's Applicant Flowchart Data Reports list Shah as "Qualified not Best Candidate" for the positions of ACMO (Jan. 2008) and Assistant Chief Mechanical Engineer (Oct. 2010).  Efron Decl. Exs. S, NN, ECF No. 55-7 at 52, 118.

legitimate, non-discriminatory reasons for each of the challenged employment decisions, which I previously described.  I must therefore examine the record as a whole to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of the NYCTA. *Byrnie*, 243 F.3d at 102.  Shah retains the ultimate burden of persuasion.  *See id.*

"Direct evidence of discrimination, 'a smoking gun,' is typically unavailable, and this case is no exception to that pattern."  *Holcomb*, 521 F.3d at 141 (quoting *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991)).  Shah has presented no evidence of statements or written notations suggesting that NYCTA decision-makers held his race or national origin against him in considering his applications for promotion.  *See, e.g.*, Shah Dep. 356:2–357:6 (acknowledging that no one at the NYCTA ever said anything insulting to him about Indians).  Indeed, other than the data on applicant race collected by the NYCTA's Equal Employment Opportunity Division, there is no evidence that the individuals responsible for the contested hiring decisions ever even acknowledged Shah's race or national origin.[9]   Nevertheless, because direct evidence of discriminatory intent is rare, this omission is not dispositive.  *See Gallo,* 22 F.3d at 1224.

Instead, Shah provides four pieces of circumstantial evidence intended to show that the NYCTA's stated reasons for denying him these 12 promotions were pretextual: (1) the allegedly inferior credentials of the successful candidates; (2) Shah's consistently strong performance reviews, which, he alleges, prove that the NYCTA's explanations for rejecting him are fabricated; (3) the bare fact that he was denied numerous promotions over four and a half years; and (4) data on the dearth of Asians and people of Indian national origin in management positions within the Department of Subways.  While these four pieces of evidence must be taken

---

[9] The closest Shah comes to presenting evidence of a direct acknowledgment of his race and national origin is in an anecdote shared at his deposition.  Shah alleges that Mike Lombardi, the brother of Greg Lombardi and a former CMO within the Department of Subways, asked Shah at a meeting whether he was Italian.  Shah allegedly responded, in jest, that "probably [he] was Italian Indian."  *See* Shah Dep. 346:6–348:21.  Shah does not allege that Lombardi responded with a follow-up comment or question.  *See id.*

together in assessing whether the record "as a whole" allows for a reasonable finding of discriminatory purpose, I will first assess the merits of each argument individually.

### a. Comparative Qualifications

I turn first to Shah's central argument that he was more qualified than the candidates hired in his place. Correctly noting that he often had both greater educational credentials and more years as a GS than the candidates selected, Shah concludes that the NYCTA's justifications for passing him over must be pretext. The NYCTA is, however, permitted to value certain qualifications over others. *Scaria v. Rubin*, 117 F.3d 652, 654–55 (2d Cir. 1997) ("As between experience and education, the IRS elected to value the first over the second in filling the job, and there is nothing to show that this value judgment was pretextual." (citation omitted)); *see also Jimenez v. City of New York*, 605 F. Supp. 2d 485, 525 (S.D.N.Y. 2009) ("[T]he law does not require that only credentials listed on a job posting can be considered when filling a position. The fact that certain types of experience are considered more desirable or valuable than educational and employment attainments like plaintiff's does not evidence discriminatory animus."). For most of the challenged positions, although the disparity in qualifications may be probative of discrimination, it is insufficient to show pretext.

For example, while **John Doherty**, who was selected in August 2008 to be a DLGM, had no college degree and far fewer years at the GS level than Shah, he had spent 14 years as the Superintendent for Road Operations and then two years as the GS for the Emergency Response Unit. Because I do not sit as a "'super personnel department' that second guesses employers' business judgments," *Byrnie*, 243 F.3d at 103, I cannot say that Knights's and Brusati's focus on Doherty's experience with work cars and emergency response was either misplaced or

prextextual.[10]   I reach the same conclusion as to all successful candidates with professional experience relevant to the position in question and substantively distinct from Shah's, whether at a private consulting firm (Knights, Wetherell), a different transportation agency (Guerra, Montgomery, Wetherell), a division of the NYCTA other than Car Equipment (Brusati, Ragusa, Cespedes, Lambert, Knights, Bowdwin), or a subdivision of the Division of Car Equipment other than South Maintenance Shops (Lombardi, Ragusa, McKernan, Sansone, Doherty, Saleh).

Significantly, NYCTA need not show that the selected candidates were *more* qualified than Shah—only that they were "equally qualified."  *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 259 (1981) ("[T]he employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria.").  Because the job postings uniformly invited applications from candidates who met certain educational and experience thresholds *or* demonstrated a "satisfactory equivalent," Shah cannot prove that any of the successful candidates were categorically unqualified.  Moreover, the observation by former NYCTA President Howard Roberts that the Job Vacancy Notices' "satisfactory equivalent" caveat helps to ensure that the education requirement is not "used to screen out women and minorities from promotion" is compelling.  Roberts Dep. 57:14-23; *accord id.* at 128:12–20. Indeed, one is struck by the number of NYCTA employees, of a range of racial backgrounds, who have been able to progress from very junior level positions to senior management, despite lacking higher education.  In the absence of persuasive evidence that the NYCTA is using the "satisfactory equivalent" language as an excuse for discrimination, it should be commended— not penalized—for creating these opportunities for meritocratic advancement.

---

[10] Doherty's quick ascension to LGM and, later, ACMO, appears to validate Knights's and Brusati's faith in him. His advancement cannot easily be dismissed as either racial bias or mere favoritism, as Doherty was selected to serve as an ACMO by a completely different set of hiring officers.

Nevertheless, there are two candidates whose credentials were almost identical to, but substantially weaker than, Shah's at the time of their promotion: **Thomas Wehrman** and **Joseph Bromfield**.  Wehrman was promoted to the position of LGM in 2009.  At the time of his promotion, Wehrman had spent seven years at the Superintendent level and three years at the GS level, while Shah had spent 14 years as a GS.  *See* Efron Decl. Ex. AA, ECF No. 55-7 at 74–75.  Both candidates had worked almost exclusively at Maintenance Shops in the South Division; while Wehrman briefly served as the Deputy Superintendent for the 207th Street Overhaul Shop, nearly two decades had since passed.  *See id.*  Indeed, Wehrman and Shah worked together at both the Coney Island Maintenance Shop and the 207th Street Maintenance Shop, and Wehrman was junior to Shah in both locations.  Shah Aff. ¶¶ 74–75.  Wehrman has an Associate's Degree in Technical Electronics, while Shah holds a B.S. in Mechanical Engineering and Master's in Transportation Management.  *See* Efron Decl. Ex. AA, ECF No. 55-7 at 74–75.  Moreover, as discussed in greater depth below, Brusati's explanation that he selected Wehrman over Shah in part because "Wehrman also had experience working as an acting ACMO," while "Shah did not have any experience in [that] area[]," is inaccurate.  Brusati Decl. ¶ 12.

Bromfield was promoted to serve as ACMO for South Maintenance Shops in July 2011.  Like Shah, Bromfield had been hired as a DLGM in 2009 out of the Division of Car Equipment.  Knights Decl. ¶ 16.  He had previously spent 12 years as a Deputy Superintendent and then Superintendent in various Maintenance Shops, and three years as the GS for the Jamaica Maintenance Shop.  Efron Decl. Ex. QQ, ECF No. 55-7 at 127.  After the Line Program was dismantled, Bromfield was briefly reinstated as GS for the Jamaica Maintenance Shop before being reassigned to serve as the GS for the West Side Lines.  *Id.*  At the time of his promotion to ACMO, he had been the GS for the West Side Lines for only eight months.  *Id.*  Bromfield does

32

not have a college degree.  *Id.*  Cortes's explanation for selecting Bromfield over Shah for this position centered on Shah's purported difficulties with subordinate employees and other managers—which, as discussed below, is unsupported by the evidence.  Cortes Decl. ¶ 24.

In *Byrnie*, the Second Circuit explained that when a plaintiff seeks to prevent summary judgment solely on the basis of a discrepancy in qualifications, the "plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'"  243 F.3d at 103 (citation omitted).  Wehrman's and Bromfield's lesser education and fewer years of experience at the GS level, *taken alone*, fail to establish that "no reasonable person . . . could have chosen" them over Shah for the vacant positions.  But they need not stand alone.  Because the alleged discrepancies in qualifications do not provide the sole basis for Shah's claims, the discrepancies do not "bear the entire burden" of showing that the NYCTA's explanations are pretext masking unlawful discrimination.  *See id.* They need only lend support for a conclusion that the NYCTA's proffered reasons for selecting Wehrman and Bromfield over Shah were pretextual—and they do.  *See Sandor v. Safe Horizon, Inc.*, No. 08-CV-4636 ILG, 2011 WL 115295, at *12 (E.D.N.Y. Jan. 13, 2011) ("[A]lthough the difference in their levels of education does not demonstrate that 'no reasonable person' could have chosen Brown for promotion rather than plaintiff, it does lend further support to the conclusion that defendant's proffered reasons for promoting Brown and not plaintiff were pretextual." (citing *Byrnie*, 243 F.3d at 103–04)).

In sum, the alleged discrepancies in qualifications between Shah and the successful candidates do not provide support for a finding of discrimination, except as to the selection of

Thomas Wehrman in April 2009 for the position of LGM, and Joseph Bromfield in July 2011 for the position of ACMO.

### b.  Criticism of Shah's Performance

Several of the NYCTA hiring officers attributed their decisions at least in part to concerns about Shah's management skills, relationship with transit unions, or gaps in qualifications.  *See* Pierce Decl. ¶¶ 11, 14 ("Mr. Shah had a history of antagonism with the union."); Sowa Dep. 25:25–26:6 ("[Shah] didn't handle as many projects as Mike McKernan did, big ones."); *id* at 25:23–25:25 (Shah "sometimes at times had a—a little friction with—with the hourly union, and what have you."); Cronin Decl. ¶ 7 ("Shah's experience was less broad as he had never successfully performed above the title of [GS]."); Brusati Decl. ¶ 12 ("Wehrman also had experience working as an acting ACMO . . . . Mr. Shah did not have any experience in [that] area[]."); Cortes Decl. ¶¶ 24–25 ("Mr. Shah's years in Car Equipment had shown him to be more of a problem creator than a problem solver.").  The truth of these criticisms is disputed.

Shah testified that he had experience performing as an Acting ACMO, which is above the title of GS, for both Maintenance and Overhaul Shops.  Shah Aff. ¶¶ 25, 27.  For example, in early 2008, Shah "was assigned the duties of an Acting [ACMO] for all the North Division Maintenance Shops, in addition to [his] existing responsibilities as a [GS] . . . ."  *Id.* at ¶ 25.  He also alleges that he was the only GS in the history of the Division of Car Equipment to have been delegated the duties and responsibilities of another subdivision.  Am. Compl. ¶ 24; Shah Dep. 215:25–216:4.  Additionally, while Sowa observed that Shah "didn't handle as many projects as Mike McKernan did, big ones," Shah testified that he

> was the only [GS] in charge of three new technology programs
> from their inception to completion . . . . As a result of my
> knowledge of these new technology programs, coupled with my
> education, background and experience, I assisted other transit

> authorities around the country and internationally for the
> implementation of these new technology programs at their
> facilities.

Shah Aff. ¶ 33; Shah Dep. 42:23–43:5.   "[A]n employer's disregard or misjudgment of a

plaintiff's job qualifications may undermine the credibility of [its] stated justification for an

employment decision."  *Byrnie*, 243 F.3d at 103 (citation omitted).

The allegations that Shah "had a history of antagonism with the union," Pierce Decl. ¶ 11,

and "repeatedly had difficulty managing his employees" and "even had difficulties with

managers from other departments [of] the Transit Authority," Cortes Decl. ¶ 24, are not reflected

in his exemplary performance reviews.  His performance reviews between 2000 and 2009 are

uniformly "excellent" or "good" overall, and most explicitly state that Shah maintains an

"excellent working relationship" with other managers and other departments.  Doshi Aff. Ex. F,

ECF No. 67-1 at 100–113.  None of the reviews mention any problems with the unions—

although the evaluation forms do not specifically ask—and Shah testifies that these allegations

"could not be further from the truth."  *See id.*; Shah Aff. ¶ 61.  He also testifies that, "[d]uring the

course of his career at NYCTA, [he] has never been reprimanded or received a warning

regarding alleged problems or issues that [he] ha[s] had with the Transport Workers' Union or

Supervisors' Union."  Shah Aff. ¶ 36.  Moreover, Shah explained at his deposition that he was

appointed in 2008 as a co-chair of the national employee training program, through which he

represented NYCTA in interactions with the co-chair of the Transit Workers Union.  Shah Dep.

153:4–22.  Shah also provided sworn testimony that he "was never made aware of these alleged

issues" regarding hourly employees and subordinate managers.  Shah Aff. ¶ 96.  Notably, Cortes,

the only affiant to claim that Shah had difficulty managing his employees, was also the person

responsible for selecting Bromfield over Shah for the position of ACMO, despite Bromfield's objectively inferior credentials.

This situation bears resemblance to *Sandor v. Safe Horizon, Inc.*, 2011 WL 115295, in which the defendant hiring officers:

> both contend[ed] that vice-presidents and managers of [defendants'] departments complained to them about plaintiff's performance, [but] defendant has not presented the testimony of these vice presidents and managers or any documents in which their complaints were recorded.  Indeed, the documentary evidence that has been provided by the parties appears to undermine [their] assertions that plaintiff's performance was perceived to be deficient. All of plaintiff's performance evaluations . . . indicate that she was either meeting or exceeding expectations, and there is no documentary evidence of any negative evaluations.

*Id.* at *11.  The judge in that case concluded that "the lack of direct evidence to support defendant's assertion that plaintiff performed poorly, in contrast to substantial evidence that plaintiff performed well and was ready for promotion, presents a credibility determination properly left to a jury."  *Id.* at *12; *accord Zimmerman v. Associates First Capital Corp.,* 251 F.3d 376, 382–83 (2d Cir. 2001) (finding that a jury could infer discrimination where plaintiff "provided ample evidence of good performance and the complete absence of any negative evaluations"); *Klings v. N.Y. State Office of Court Admin.,* No. 04-CV-3400 KAM LB, 2010 WL 1292256, at *15 (E.D.N.Y. Apr. 5, 2010) (finding that "the stark disparity between [plaintiff's] complimentary written performance evaluations, and the criticisms now being asserted, coupled with [plaintiff's] sworn denial that she was orally counseled about these criticisms, creates a genuine issue of fact for the jury's determination" (citations omitted)).

Finally, Cortes's criticisms of Shah's performance and reputation are contradicted by the testimony of other NYCTA employees.  Marika Herard, who worked in Human Resources, testified that Shah "had a solid reputation.  He was demanding, but they always respected his

work.  He did—he had good results."  Doshi Decl. Ex. B, ECF No. 67-1 at 62.  She testified further that, while she was employed at the NYCTA, Shah's job performance was "[e]xcellent.  Good to excellent."  *Id.*, ECF No. 67-1 at 65.  She would "[a]bsolutely" characterize him as one of the top performers.  *Id.*  Kevin O'Connell, who participated in Shah's interview for the ACMO position awarded to George Cortes in October 2005 (which is time-barred) noted that, based in part on Shah's "ability to work well with others," he would have selected Shah over Cortes.  Doshi Decl. Ex. D, ECF No. 67-1 at 81–84.  "Proof that the defendant's explanation is unworthy of credence is . . . probative of intentional discrimination, and it may be quite persuasive."  *Byrnie*, 243 F.3d at 102 (quoting *Reeves*, 120 S. Ct. at 2108).

### c.  The Number of Rejections

Shah's brief in opposition to summary judgment notes that defendants have "repeatedly" denied him promotions—totaling "nearly 30 positions in total," by Shah's count—"for over 10 years."  Mem. Opp'n Mot. Summ. J. 1, 3.  While "the sheer number of failures to select [Shah] for a job" is undoubtedly significant from Shah's perspective, it is not enough on its own to raise a genuine issue of fact on the issue of pretext.  *Jimenez*, 605 F. Supp. 2d at 523 (citing cases).  This is particularly so because the 12 independent denials of promotions were made by seven different decision-makers—Richard Sowa, Judith Pierce, William Cronin, David Knights, Louis Brusati, George Cortes, and Carmen Bianco—and plaintiff has "adduced absolutely no evidence of any conspiracy among these various decision-makers."  *Id.* at 524.  Nevertheless, each of these individuals denied Shah at least two promotions, and Bianco and Cortes each denied Shah promotions on *three* occasions.  The fact that Shah was repeatedly denied promotions by each of these decision-makers provides some limited support for a finding of unlawful discrimination.

### d.   Data on the Number of Asians in the Department of Subways

Similarly, Shah's numerical evidence—"it cannot fairly be called statistical evidence"—is insufficient on its own to create a triable issue.  *See Abdullah v. Skandinaviska Enskilda Banken Corp.*, No. 98 CIV. 7398 (JSR), 1999 WL 945238, at *8 (S.D.N.Y. Oct. 19, 1999).  "[P]laintiff's raw numbers prove nothing in the absence of any analysis of their statistical significance or of any comparative data showing the demographics of the relevant labor pool." *Id.* (citation omitted).  Moreover, because the sample size is too small to yield meaningful statistical evidence," any inference drawn from plaintiff's data "would be of little value in proving discrimination."  *Id.* (citations omitted).  Indeed, Shah's numerical evidence is undermined by the NYCTA's Applicant Flow Data Reports, which show that Asians made up a minor percentage of the applicants for most of these positions, and "qualified" Asians an even smaller proportion.[11]  The NYCTA's selection of an Indian man for the position of Deputy Vice-President, Engineering Services, in May 2008, somewhat undercuts an inference of discrimination, but carries no great significance given the very limited sample size.  Efron Decl. Ex. V, ECF No. 55-7 at 61.  Shah's numerical data is, therefore, neutral at best.

### e.   The "Record as a Whole" as to Shah's Discrimination Claims

Taking these four arguments together, I find that a genuine dispute of material fact exists as to plaintiff's claims under Title VII and the SHRL that he was unlawfully discriminated against by the NYCTA in April 2009, when he was passed over for the position of LGM, and July 2011, when he was denied a promotion to ACMO.  I reach this conclusion principally on the basis of Wehrman's and Bromfield's objectively inferior credentials; Cortes's unsupported

---

[11] NYCTA's Applicant Flow Data Reports are available for five of the contested positions.  Of the 162 distinct applicants for those positions, 11—or 6.7 percent—are Asian.  *See* Efron Decl. Exs. O, S, Y, DD, NN, ECF No. 55-7 at 41–44, 52–53, 69, 86, 118.  Shah is the only Asian applicant identified in any of the five reports as "Qualified not Best Candidate." The others are described as "Not Interviewed" or "Lacks required experience."  *Id.*

criticisms of Shah's management skills and Brusati's disregard of Shah's experience as an Acting ACMO; and the fact that Cortes thrice denied Shah's applications for promotion to the position of ACMO, a position for which he was concededly qualified.

While the rejection of Shah's application for the position of LGM in October 2007 is also somewhat questionable in light of Pierce's unsupported allegation that Shah had "a history of antagonism with the unions" and the fact that two of the successful candidates, Ragusa and Lambert, lacked college degrees, on whole, I do not believe that a reasonable jury could reach a finding of discrimination as to that claim.  As Pierce explained, Ragusa and Lambert each had unique and compelling experience qualifying them to serve as LGMs.  Moreover, while the NYCTA did not provide any documentary evidence to support Pierce's assertion that Shah had an "antagonis[tic]" relationship with the unions, that criticism—unlike Cortes's assertion that Shah had difficulty managing his staff—is not directly contradicted by Shah's performance reviews, and was articulated independently by both Pierce and Sowa.

Recognizing that an EEOC determination is not entitled to special weight, but mindful of the probative value of a finding of discrimination by "an investigator, trained and experienced in the area of discriminatory practices and the various methods by which they can be secreted," *see Strauss v. Microsoft Corp.*, No. 91 CIV. 5928 (SWK), 1995 WL 326492, at *3 (S.D.N.Y. June 1, 1995), I considered the EEOC's finding that the NYCTA discriminated against Shah, including in denying him the October 2007 promotion discussed above.  I remain convinced, however, that Shah has failed as a matter of law to show that those rejections were a product of discrimination. I note in particular that the EEOC did not have the benefit of Roberts's uncontroverted deposition testimony that allowing candidates without higher education to compete for senior management positions is a means of *enhancing* diversity within the NYCTA.

Because I find that no genuine dispute exists as to any of the contested positions other than the April 2009 and July 2011 rejections, I grant the NYCTA's motion for summary judgment as to all of Shah's claims under Title VII and the SHRL other than the denials of promotion in April 2009 and July 2011.

### D.  Shah's Retaliation Claims under Title VII and the SHRL

#### 1.  Legal Standards

Like discrimination claims, retaliation claims brought under the SHRL are "evaluated identically" to claims brought under Title VII.  *Alexander v. Westbury Union Free Sch. Dist.*, 829 F. Supp. 2d 89, 113 (E.D.N.Y. 2011); *see also Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010); *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006) (citations omitted). As such, I again consider Shah's federal and state law claims together.

Title VII is violated when "a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause." *Terry*, 336 F.3d at 140–41 (citing *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993)). To establish a *prima facie* case of retaliation under Title VII, "an employee must show '(1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action.'" *Id.* (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998)).  The *McDonnell Douglas* burden-shifting analysis applies to retaliation claims brought pursuant to Title VII.  *Id.*

"Plaintiff's burden to establish a prima facie case, which is 'minimal,' can be met by proffering evidence of a close temporal connection between the protected activity and the adverse employment action."  *Separ v. Nassau Cnty. Dep't of Soc. Servs.*, No. 11-CV-2668 PKC, 2014 WL 4437676, at *7 (E.D.N.Y. Sept. 9, 2014) (citation omitted); *Grant v. Bethlehem Steel*

*Corp.*, 622 F.2d 43, 45–46 (2d Cir. 1980) (finding an eight-month gap between protected activity and adverse action sufficient to support an inference of retaliation).  Nevertheless, "without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010).

### 2. Analysis

Despite the allegations in Shah's complaint that he suffered numerous retaliatory actions, including demotions, transfers, denial of office space, and neglect by his supervisors, *see* Am. Compl. ¶¶ 32–54, Shah states in the Title VII portion of his brief in opposition to summary judgment that, "[t]o avoid any confusion, Plaintiff is relying solely on the denials of promotions [to CMO in July 2008 and to GGM in August 2008] as the adverse employment actions," Mem. Opp'n Mot. Summ. J. 46.  Moreover, Shah does not address in his brief whether any of the other allegedly retaliatory actions rose to the level of "adverse employment actions," or provide evidence to establish a causal link between his EEOC complaint and these other actions, some of which allegedly occurred nearly five years later.  Under these circumstances, I find that Shah abandoned his retaliation claims under Title VII and the SHRL except as to the two rejections in the summer of 2008 on which he expressly relies.  *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." (citation omitted)).

Shah does make out a prima facie case as to the two rejections in the summer of 2008.  A denial of promotion constitutes an adverse employment action, *Terry*, 336 F.3d at 139, and the temporal proximity between Shah's EEOC complaints and these denials—just two to three

months later—is sufficient to establish an inference of a causal link.  The NYCTA has, however, provided plausible, non-discriminatory explanations for its selection of Sansone, Knights, Brusati, Lombardi, Cespedes, and Bowdwin over Shah, and temporal proximity alone is insufficient to raise a triable issue of fact as to whether the rejections were motivated by discrimination.  *El Sayed*, 627 F.3d at 933.  This is particularly so because Shah claims that the pattern of rejection commenced several years before his EEOC filing.  *See Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001), *as amended* (June 6, 2001).  Shah's retaliation claims as to the denials of promotion in July and August 2008 fail.

### E.  *Shah's Claims Pursuant to the New York City Human Rights Law*

Shah's discrimination and retaliation claims under the New York City Human Rights Law ("CHRL") must be analyzed "separately and independently from any federal and state law claims," and construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible."  *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (citations omitted).

#### 1.  Discrimination Claims

Because the NYCTA has failed to show that it is entitled to summary judgment on Shah's discrimination claims under Title VII and the SHRL as to the April 2009 and July 2011 denials of promotions, *a fortiori* it is not entitled to summary judgment on those claims under the more expansive CHRL.  *Dillon v. Ned Mgmt., Inc.*, No. 13-CV-2622, 2015 WL 427921, at *17 (E.D.N.Y. Feb. 2, 2015).  The critical question is whether Shah's *other* discrimination claims can survive summary judgment under the CHRL, even if not under Title VII and the SHRL.

They cannot.  The CHRL "simplified the discrimination inquiry: the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason."

*Mihalik*, 715 F.3d at 110 n.8.  Nevertheless, "summary judgment still can be an appropriate mechanism for resolving NYCHRL claims" where "the record establishes as a matter of law that a reasonable jury could not find the employer liable under any theory."  *Mihalik*, 715 F.3d at 111, 113.  Shah has demonstrated only that he was qualified in different—but not objectively superior—ways than the successful candidates.  Moreover, former NYCTA President Howard Roberts gave uncontroverted testimony that the NYCTA *enhances* diversity in its ranks by giving hiring officers flexibility to promote candidates on the basis of merit rather than educational advancement or seniority alone—a philosophy borne out by the agency's diverse staff.  *See* Roberts Dep. 57:14-23; *see also id.* at 128:12–20, 121:21–122:24.  The absence of any documentary evidence corroborating some of the hiring officers' criticisms of Shah's performance is probative of discrimination, but cannot defeat summary judgment alone.  For all decisions other than the April 2009 and July 2011 rejections, a reasonable jury could not, therefore, find that the NYCTA hiring officers were motivated by discrimination.

### 2.  Retaliation Claims

Under the CHRL, in contrast to Title VII or the SHRL, a plaintiff alleging retaliation "need not prove any materially adverse employment action, only that the employer 'engaged in conduct that was reasonably likely to deter a person from engaging' in a protected activity." *Carter v. Verizon*, No. 13 CIV. 7579 KPF, 2015 WL 247344, at *13 (S.D.N.Y. Jan. 20, 2015) (citing *Mihalik,* 715 F.3d at 112).  This "assessment [should] be made with a keen sense of workplace realities, of the fact that the 'chilling effect' of particular conduct is context-dependent, and of the fact that a jury is generally best suited to evaluate the impact of retaliatory conduct."  *Milhalik*, 715 F.3d at 112 (citation omitted).  A defendant is not liable, however, if the plaintiff fails to prove that the conduct in question was caused at least in part by retaliatory

motives, or if the defendant proves the conduct was nothing more than "petty slights or trivial inconveniences." *Id.* at 113.

The retaliation claims that Shah abandoned under Title VII and the SHRL may arguably be cognizable under the CHRL.  I reach this conclusion on the basis of a Talmudic analysis of the language used in Shah's brief.  Specifically, Shah's statement that he "is relying solely on the denials of promotions as the adverse employment actions" arises only in the Title VII portion of his brief.  Further, Shah uses the language of Title VII ("adverse employment actions") rather than the language of the CHRL ("reasonably likely to deter") in abandoning those claims.[12] Mem. Opp'n Mot. Summ. J. 46.  On the assumption that Shah's retaliation claims pursuant to the CHRL were not abandoned, I consider them now *seriatim*.

(i)   Denials of Promotion in July and August 2008

First, Shah claims that he was denied three promotions within three months of filing his EEOC complaint, and that these rejections were motivated in part by retaliation: in July 2008, he applied for and was denied a promotion to the position of CMO, and in August 2008, he applied for and was denied promotions to the positions of GGM and DLGM.

Shah relied only on the denials of promotion to CMO and GGM as the "adverse employment actions" for purposes of his retaliation claims under Title VII and the SHRL.  Mem. Opp'n Mot. Summ. J. 46.  These claims fail under the CHRL for the same reason that they fail under federal and state law: Shah failed to produce any evidence, other than temporal proximity, of a causal link between his EEOC filing and these rejections.  Moreover, the CMO and GGM positions are each roughly two levels above GS, the position that Shah held at the time of these

---

[12] By contrast, I construe this language as an abandonment of all but two of Shah's retaliation claims under the *state* human rights law, because SHRL and Title VII claims are "evaluated identically," *Alexander*, 829 F. Supp. 2d at 113, and the Second Circuit also utilizes the "adverse employment action" framework in evaluating state law claims, *see Hicks*, 593 F.3d at 164.

applications, and the GGM position was particularly competitive.  Shah was one of 110 applicants for the GGM position, 102 of whom—including Shah—did not receive an interview. Efron Decl. Ex. O, ECF No. 55-7 at 41–44.  Shah has thus failed to produce sufficient evidence to create a triable issue of fact as to whether these rejections were motivated by retaliation.

Shah also did not put forth sufficient evidence to allow a reasonable jury to find that the denial of promotion to the position of DLGM in August 2008, for which only one other applicant from the Division of Car Equipment, John Doherty, was selected, was retaliatory in nature. Indeed, as detailed below, Shah was chosen for the exact same position by the exact same hiring officers—Knights and Brusati—just eight months later.  There is no evidence that Knights and Brusati had insidious motives for passing over Shah in the first round of applications.

(ii)  Assignment as DLGM for "R" Line (April 2009)

Second, Shah claims that his April 2009 assignment as DLGM for the "R" Line from Jamaica Maintenance Shop involved multiple retaliatory actions: (a) the reassignment to DLGM was a demotion from the GS position he was then holding, Am. Compl. ¶ 25; Shah Dep. 191:11– 20; (b) he was assigned to work on "one of the worst performing subway lines," Am Compl. ¶ 34; (c) he was not provided office space for the first three months of his assignment, *id.* at ¶ 35; Shah Dep. 192:12–16, 325:2–326:7, 331:6–11; and (d) he was asked to attend LGM training classes, Am. Compl. ¶ 33.  Shah does not provide sworn testimony as to several of these allegations.  Nevertheless, I will proceed to analyze the merits of each of these claims.

Shah's categorization of the DLGM position changes depending on the context.  He depicts it variously as a promotion that he was denied, Shah Aff. ¶¶ 62–65, as a lateral move, *see id.* at ¶ 66, and as a demotion, Am. Compl. ¶ 25.  At his deposition, Shah explained that the responsibilities of a DLGM were "hundred percent same duties" as those of an LGM, the more

45

senior position, Shah Dep. 97:17–22; conceded that he "enjoy[ed] the variety of work" as a DLGM, *id.* at 98:6–8; and acknowledged that he received a five percent salary increase when he moved from GS to DLGM, *id.* at 103:10–14.  Under these circumstances, Shah's appointment as DLGM cannot be deemed conduct that was reasonably likely to deter a person from engaging in a protected activity.

By contrast, Shah's claims that he was denied permanent office space for the first three months of his term as DLGM and assigned to work on one of the "worst-performing subway lines"[13]—a concept that he neither defines nor illustrates with examples—could be construed as conduct reasonably likely to have a chilling effect on employees.  Nevertheless, Shah failed to produce evidence of a causal connection between his EEOC complaint in May 2008 and his assignment in April 2009 to serve as the DLGM for a poorly performing subway line.  Indeed, the only available evidence suggests otherwise.  Shah speculated that Lombardi had him assigned to the "R" line because he did not want Shah to serve on any of the lines in his own group.  Shah Dep. 330:24–332:7.  Brusati testified, however, that he personally selected Shah to serve as a DLGM within his group of subway lines, which included the "R" line, "because of [Shah's] expertise in Car Equipment, his managerial experience and his perspective as an engineer."  Brusati Decl. ¶ 15.  Brusati also stated that he was unaware at that time that Shah had filed an EEOC complaint.  *Id.* at ¶ 16.  Without more, a reasonable jury could not find that this action was motivated, even in part, by retaliation.

Similarly, Shah did not put forth any evidence supporting his claim that he was temporarily denied office space in retaliation for the EEOC complaint he had filed nearly a year

---

[13] Shah in fact complains that the *Jamaica Maintenance Shop*, from which he served as a DLGM for the "R" line, was one of the "worst-performing subway lines."  Am. Compl. ¶ 34.  I assume that this was a typographical error, and that he intended to refer here to the "R" subway line, not the Jamaica shop.  *See* Shah Dep. 331:6–11 ("It's call[ed] Jamaica, but they did not give me Jamaica shop, they put me on the . . . . R line on the road.").

earlier.  While Shah testified at his deposition that Brusati "harass[ed] and retaliate[d]" against him by "not giv[ing] [him] any place to work from, no office, no location," when asked immediately thereafter why he believed that Brusati's failure to assign him a workspace was retaliation for filing a complaint, Shah answered: "I don't know why he did it."  *Id.* at 325:8–23.  "[T]he ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary."  *Campbell v. United States*, 365 U.S. 85, 96 (1961).  There is, however, simply no evidence of a causal connection between Shah's assignment to the "R line on the road," *id.* at 331:6–11, and the EEOC complaint he filed 11 months earlier.  Even if eleven months was sufficiently close in time to raise an inference of pretext—and it likely is not, *see, e.g., Howard v. City of New York*, 602 Fed. App'x 545, 547 (2d Cir. 2015) (finding a ten month gap "too remote[] to support an inference that the adverse action was motivated by racial bias")—"without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext," *El Sayed*, 627 F.3d at 933.  Shah has therefore failed to create a genuine issue of material fact as to whether the denial of office space was retaliatory in motivation.

Finally, the fact that Shah was asked to attend LGM training classes is consistent with his deposition testimony that the responsibilities of a DLGM were "hundred percent same duties" as those of an LGM.  Shah Dep. 97:17–22.  To the extent that the training classes were unnecessary in light of Shah's extensive GS experience, they were, at worst, a "petty slight[] or trivial inconvenience[]."  *Mihalik*, 715 F.3d at 113.

(iii) <u>Multiple Transfers Between April 2010 and June 2012</u>

Third, Shah claims that he was transferred three times between 2010 and 2012 in retaliation for his 2008 EEOC complaint.  In April 2010, after the Line Program was dismantled,

Shah was reassigned from his position as DLGM to serve as the Acting GS for the 207th Street Overhaul Shop.  Am Compl. ¶ 36; Shah Aff. ¶ 27.  Over the course of the next two years, Shah was reassigned twice more: to the Pitkin and 207th Street Maintenance Shops, and then to the Jamaica Maintenance Shop.  Shah alleges that these transfers required a longer commute, *see* Am. Compl. ¶ 36, and that Pitkin and 207th Street were "two of the worst performing Maintenance Shops," Shah Aff. ¶¶ 27–29; Shah Dep. 270:13–25, 272:2–4.  He also alleges that he was the only GS in his division to have been transferred so many times during this period.  Shah Dep. 187:24–189:21.  Such repeated transfers could be deemed conduct reasonably likely to have a chilling effect on employees.

Nevertheless, Shah has not put forth sufficient evidence to establish a causal connection between the transfers and the filing of his EEOC complaint, which occurred two to four years earlier.  *See, e.g.*, *Richards-Byers v. N.Y.C. Dep't of Fin.*, 449 F. App'x 55, 57 (2d Cir. 2011) (where plaintiff's transfer occurred "more than a year" after her EEO interview, finding that "such attenuated temporal proximity cannot support an inference of retaliatory intent"); *Marini v. Costco Wholesale Corp.*, 64 F. Supp. 3d 317, 333 (D. Conn. 2014) (finding "little temporal nexus between any of [plaintiff's] ADA complaints and his termination" where he lodged his internal, state, and federal complaints, respectively, "more than two years," "about 22 months" and "more than eight months," before he was fired), *reconsideration denied*, No. 3:11-CV-00331 JAM, 2015 WL 1169284 (D. Conn. Mar. 13, 2015).

The lack of sufficient evidence is most apparent with regard to the first transfer, which Shah acknowledged was due to the fact that "[t]hey stopped the [Line] program and change[d] the level to go back to the old management style."  Shah Dep. 98:19–22.  While NYCTA's justifications for the subsequent transfers are disputed—Cortes describes them as a product of

48

Shah's poor performance and fraught relationships, *see* Cortes Decl. ¶¶ 7–10, which Shah disputes and his performance reviews contradict—there is no evidence to indicate that Cortes's explanations are pretext for retaliation.  Indeed, Cortes declared that "it is [his] recollection that [he] did not even know of any such [EEOC] complaints until many years later."  Cortes Decl. ¶ 26.  Nor does the record suggest any reason why Cortes would have known about the complaints, particularly since he was not one of the hiring officers against whom the EEOC complaint was made.  Without more, the relationship between the 2011 and 2012 transfers and Shah's 2008 filing is too attenuated to raise an issue of fact as to whether Cortes was motivated by retaliation.

Shah's related allegations that he was: (a) temporarily demoted to the position of "Acting" GS; (b) asked to reapply for the position of GS despite having held such a position for over a decade; and (c) denied official acknowledgment of his new title, are both contradicted by Shah's own testimony, *see, e.g.*, Shah Aff. ¶ 27; Shah Dep. 165:8–14, and, at most, "trivial inconveniences," *Mihalik*, 715 F.3d at 113.  I therefore grant the NYCTA's motion for summary judgment as to each of these retaliation claims.

### (iv)  Shah's Interactions with Supervisors

Finally, Shah alleges that, in February 2013, Carmen Bianco failed to respond to Shah's request for approval regarding post-retirement employment.  Am. Compl. ¶ 52.  He alleges that either Bianco or Michael Wetherell then informed Shah's supervisor, Joseph Bromfield, of his request, causing Bromfield to express unhappiness with Shah and "neglect[]" him for weeks.  *Id.* at ¶ 53.  Shah further alleges that Bromfield recently called him into his office and "he said I went to EEOC, and I had . . . a complaint [sic] New York City Transit about my promotion . . . .  He told me he wouldn't trust me and he [sic] never shake hand with me . . . .  I remember that because he say [sic] it."  Shah Dep. 137:13–138:24.  Shah has not put forth any evidence

demonstrating that Bianco's or Wetherell's behavior was connected in any way to Shah's EEOC filing, and Bromfield's statement to Shah amounts only to a "petty slight." *Mihalik*, 715 F.3d at 111, 113.  These claims cannot survive defendant's motion for summary judgment.

## CONCLUSION

The NYCTA's motion for summary judgment is granted as to all of Shah's discrimination claims, except for the claims relating to the denials of promotion to LGM in April 2009 and ACMO in July 2011.  I also grant the NYCTA's motion for summary judgment as to all of Shah's retaliation claims.

**SO ORDERED.**

Brooklyn, New York
July 9, 2015                                                    *Edward R. Korman*
                                                               Edward R. Korman
                                                               Senior United States District Judge

50